IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

GEORGE F. WESSON            )
                           )
v.                         )    No. 3:07-0798
                           )    Judge Wiseman/Bryant
SOCIAL SECURITY ADMINISTRATION    )


To:  The Honorable Thomas A. Wiseman, Jr., Senior Judge


### REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §
405(g), to obtain judicial review of the final decision of the
Social Security Administration ("SSA") denying plaintiff's
application for disability insurance benefits ("DIB"), as
provided under Title II of the Social Security Act ("the Act"),
as amended.  The case is currently pending on plaintiff's motion
for summary judgment (Docket Entry No. 11), which the undersigned
construes as a motion for judgment on the administrative record
in accord with the scheduling order (Docket Entry No. 7).
Defendant has responded in opposition to plaintiff's motion
(Docket Entry No. 14).  Upon consideration of these papers and
the transcript of the administrative record (Docket Entry No. 5),
and for the reasons given below, the undersigned recommends that
plaintiff's motion for judgment be **DENIED**, and that the SSA's
decision be **AFFIRMED**.

1

# I. Introduction

Plaintiff filed his DIB application on July 25, 2002, alleging that he had been disabled since May 11, 2001, due to head injuries, headaches, and depression (Tr. 56-59, 71). This application was denied at the initial stage of agency review, and again on reconsideration (Tr. 34-37). Plaintiff thereafter requested and received a *de novo* hearing of his case before an Administrative Law Judge ("ALJ"). The ALJ heard the case on May 28, 2004, including testimony from plaintiff, his wife, and an independent vocational expert (Tr. 362-93). Plaintiff was represented at the hearing by the same attorney who represents him before this court. After hearing the evidence and argument of counsel, the ALJ took the case under advisement until August 10, 2004, when he issued a written decision denying plaintiff's claim (Tr. 22-28). The ALJ's decision contains the following enumerated findings:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant's diabetes mellitus, organic disorder, depression, and history of obesity are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).

3. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4. The undersigned finds the claimant's allegations

2

regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

5.  The claimant retains the residual functional capacity to perform simple, routine, light work, performing postural activities only on an occasional basis, but never climbing ladders, ropes, or scaffolds, no constant reaching with the left arm, frequent fingering, occasional exposure to hazards, and only occasional contact with the general public.

6.  The claimant is unable to perform any of his past relevant work (20 CFR § 404.1565).

7.  The claimant is a "younger individual between the ages of 45 and 49" (20 CFR § 404.1563).

8.  The claimant has a "high school (or high school equivalent) education" (20 CFR § 404.1564).

9.  The claimant has transferable skills from skilled work previously performed as described in the body of the decision (20 CFR § 404.1568).

10. The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 404.1567).

11. Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rule 202.21 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform.

12. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(g)).

(Tr. 27-28)

On May 25, 2007, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 5-8), thereby rendering that decision the final decision of the SSA. This civil action was thereafter timely filed, and the court has

Case 3:07-cv-00798   Document 15   Filed 09/19/08   Page 3 of 22 PageID #: 57

jurisdiction. 42 U.S.C. § 405(g). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

## II. Review of the Record[1]

### A. Medical Evidence

The record shows that plaintiff has a history of multiple head injuries dating back to the 1980s (Tr. 164). He reported that one injury involved hitting his head on a car hatchback, in another he was ejected from a car and sustained an open head injury, and in the third he was struck with a gun by a policeman, sustaining a frontal lobe depressed skull fracture. Id. His injuries resulted in a diagnosis of Frontal Lobe Syndrome (Tr. 248). He reported significant cognitive damage but eventually went to vocational rehabilitation and returned to work as a tool grinder/machinist in 1992 (Tr. 71-72, 369). An August 1999 EEG was normal (Tr. 287). However, due to developing depression, he stopped working in May 2001. Id.

In May and August 2000, Dr. John Griscom reported that plaintiff's diabetes was under control (Tr. 231, 237). In October 2000, plaintiff underwent a neurological evaluation by Ronald E. Wilson, M.D., for complaints of episodes of weakness

---

[1]The larger part of the following summary of the record evidence is taken verbatim from defendant's response brief (Docket Entry No. 14 at 3-9).

4

and feeling "as if I am going to die," particularly after meals (Tr. 138). A chest x-ray and ventilation perfusion scan were normal, as well as CT scans of his abdomen and pelvis (Tr. 138-39). Plaintiff reported a diagnosis of insulin dependent diabetes (IDM) since October 1999 (Tr. 139). He was advised to increase his fluid intake after meals, reduce his food intake, and have a small amount of caffeine with meals. Id. His medications were adjusted to prevent orthostatic hypotension, and cardiac monitoring and a sleep study were recommended. Id.

Plaintiff presented to an emergency room in May 2001 complaining of chest tightness and pain in his left arm radiating to his shoulder (Tr. 149). His blood pressure was 180/120 when checked at work but at the time of arrival in the emergency room, his blood pressure was 120/73, his chest pain had resolved and he had minimal left arm and shoulder symptoms. He was treated with Klonopin[2] for anxiety and a stress test was planned (Tr. 150-52). Cardiac (Holter) monitoring was normal (Tr. 141).

In August 2001, plaintiff was studied for complaints of daytime fatigue and diagnosed with very severe obstructive sleep apnea (Tr. 146). Nightly use of nasal Continuous Positive Airway Pressure (CPAP) 15cm was initiated, and plaintiff's snoring stopped and his sleep efficiency improved. Id.

---

[2]Klonopin is an anticonvulsant. The Pill Book 254 (Harold M. Silverman, Pharm. D., ed.) (12th ed. 2006).

In November 2001, plaintiff was examined by psychiatrist, William M. Petrie, M.D., at the request of his family doctor, Deepinder Bal, M.D. (Tr. 193-94). He reported a history of depression since the late 1980s when he sustained head injuries. His symptoms included poor concentration, crying spells, loss of interest, and a sense of alienation from his interests and God. He reported a fairly good response with Effexor.[3] His other medications included insulin, Microzide, TriCor, Trazodone, Pamelor, and Zestril.[4] His brother and mother had cared for him the previous several months. Plaintiff also reported headaches, loss of initiative, and reduced libido (Tr. 194). Mental diagnoses included recurrent depression and mixed personality disorder with a Global Assessment of Functioning (GAF) estimated at 40 currently and 60 during the previous year. Dr. Petrie increased plaintiff's doses of Effexor and Pamelor. Id. Subsequent progress notes in June 2002 indicated symptoms of persistent fatigue, decreased energy, tearfulness, and forgetfulness (Tr. 192). Dr. Petrie added Metadate[5] to plaintiff's medications. Id. Improvement was noted in August

---

[3]Effexor is an anti-depressant. The Pill Book at 1050.

[4]Microzide is a diuretic. TriCor is used to treat high blood cholesterol. Trazodone is an antidepressant. Pamelor is an antidepressant. Zestril is used to treat hypertension. The Pill Book at 476, 638, 1057, 1104, 1122.

[5]Metadate is a mild central nervous system stimulant. The Pill Book at 662.

6

and Adderall[6] was also prescribed (Tr. 190-91). Two months later plaintiff was described as showing good spontaneity and was trying to work at his church (Tr. 189).

In January 2002, Dr. Petrie wrote a note stating that plaintiff was "currently unable to work for medical reasons . . . for an indefinite period" (Tr. 195). In April 2002, Dr. Petrie reported that plaintiff was improved with less affective lability, although he complained of not processing things well and feeling sluggish (Tr. 307). Plaintiff stated that he wanted to go back to work. In June 2002, Dr. Petrie prescribed oxycodone[7] for headaches (Tr. 192).

In October 2002, at the request and expense of the Tennessee Disability Determination Services (DDS), plaintiff underwent a psychological evaluation by William O'Brien, Psy. D (Tr. 164-68). He was alert and oriented and had driven himself to the evaluation (Tr. 165). His height was six feet and weight was 350 pounds. He reported his medical history as IDM, hypertension, and sleep apnea. He visited Dr. Petrie every two months to treat depression. From 1991 to 2001, he received outpatient psychiatric services with Dr. Bal. No inpatient psychiatric treatment was noted. Current medications included Effexor and Adderall (Tr. 165). Plaintiff related that in May

---

[6]Adderall is a central nervous system stimulant. The Pill Book at 30.

[7]Oxycodone is a narcotic used for pain and cough. The Pill Book at 274.

7

2001, he was placed on medical leave from his machinist job due to slow work performance which plaintiff attributed to depression (Tr. 166). He also reported quitting a truck driver job after sustaining head injuries when a policemen hit him, resulting in his becoming lost while traveling familiar routes. His examination was unremarkable, judgment and insight were fair to good and attention and concentration were intact. His intellectual functioning was estimated as borderline to low average (Tr. 167). He reported a typical day as uneventful. He prepared simple meals, swept and mopped floors, removed trash, and ran errands (Tr. 167). Dr. O'Brien diagnosed moderately severe major depressive disorder, recurrent, and recommended that plaintiff receive further evaluation for intellect, memory, and possible exaggeration of symptoms (Tr. 168).

In April 2003, Dr. Petrie wrote a letter to plaintiff's attorney stating that plaintiff had an organic affective disorder from his frontal lobe injury resulting in problems with executive functioning and reasoning (Tr. 304). He had no psychotic symptoms but had depression, headaches, and loss of initiative. Dr. Petrie opined that plaintiff was unable to function in a work setting. Id.

In May 2004, Dr. Petrie completed a "Medical Source Statement of Ability To Do Work-Related Activities (Mental) (MSS-Mental) (Tr. 326-27). He checked that plaintiff's ability to

8

understand and remember and carry out short, simple instructions was "slightly" affected. He marked that plaintiff's ability to understand, remember, and carry out detailed instructions and to make judgments on simple work-related decisions was "moderately" affected (Tr. 326). Plaintiff's ability to interact appropriately with the public and respond appropriately to changes in a routine work setting was "slightly" affected, and his ability to interact with supervisors and co-workers and respond appropriately to work pressures was "moderately" affected (Tr. 327). Dr. Petrie noted that plaintiff's stamina and concentration were simply "reduced." Id.

### B. Testimonial Evidence

Plaintiff testified at his May 2004 hearing that his history of head injuries had left him suffering bouts of confusion, frequent crying spells, and continued deterioration (Tr. 366-68). He testified that he had been diagnosed with depression in 2001, and also experienced problems related to obesity, swelling in his feet, hands, and knees, left shoulder pain, aching legs, constant headaches, and low blood sugar levels (Tr. 369-78). He testified that he used a CPAP machine to combat the effects of his sleep apnea, but still fell asleep during the day (Tr. 373). He testified that his headaches occurred daily, sometimes lasting two hours and requiring him to sit in the dark and remain still (Tr. 377). He testified that during the day, he

9

read the Bible and other materials, and listened to the radio (Tr. 374). Sometimes he performed work at his church (Tr. 380). He estimated that he could walk two blocks and stand for one-half hour, and could spend half the workday on his feet (Tr. 371-72).

Plaintiff's wife gave testimony corroborating his own testimony, and further stated that he gets lost and needs someone close by to get him back on track, and that he also falls asleep, becomes frustrated easily, and cries. She testified that he does not always follow his diabetic diet, resulting in fluctuating blood sugar levels (Tr. 383-85).

A vocational expert also testified, identifying available light and sedentary jobs in response to the ALJ's hypothetical containing the limitations that were ultimately assigned to plaintiff (Tr. 388). The expert also testified that if a person's symptoms required him to lie down one hour each workday, in addition to the time allotted for lunch and work breaks, that person would not be able to work (Tr. 389). The expert further testified, under examination by plaintiff's attorney, that Dr. Petrie's May 2004 assessment of mental limitations related to work would not interfere with the ability to perform the jobs previously identified (Tr. 392).

10

### III. Conclusions of Law

#### A. <u>Standard of Review</u>

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. <u>Elam ex rel. Golay v. Comm'r of Soc. Sec.</u>, 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Rogers v. Comm'r of Soc. Sec.</u>, 486 F.3d 234, 241 (6th Cir. 2007)(<u>quoting Cutlip v. Sec'y of Health & Human Servs.</u>, 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. <u>Her v. Comm'r of Soc. Sec.</u>, 203 F.3d 388, 389 (6th Cir. 1999).

#### B. <u>Proceedings at the Administrative Level</u>

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or

Case 3:07-cv-00798   Document 15   Filed 09/19/08   Page 11 of 22 PageID #: 65

mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.
>
> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.
>
> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the

claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

13

C.  <u>Plaintiff's Statement of Errors</u>

Plaintiff argues that the ALJ improperly rejected the medical opinions of his treating physicians, internist Deepinder Bal, M.D., and psychiatrist William Petrie, M.D., without giving specific reasons for this rejection.  He further argues that his testimony and that of his wife was improperly rejected under the rules and regulations governing the ALJ's analysis of subjective symptoms, and therefore that the ALJ's finding of available work which plaintiff could perform is improperly based on vocational expert testimony which did not consider the discredited symptoms/limitations.  Plaintiff also alleges, in summary fashion, that the ALJ failed to properly consider the combined effect of his mental and physical impairments, and that he failed to make the proper determination at step three of the sequential evaluation process.  Finally, plaintiff quotes the language of several Social Security Rulings, the provisions of which he claims were violated by the ALJ in this case.  As explained below, the undersigned finds no merit in plaintiff's allegations of error, and concludes that the substantially supported agency decision should be affirmed.

Regarding the opinions of plaintiff's treating physicians, it must first be noted that three of the assessments highlighted in the "statement of the facts" section of plaintiff's brief are not to be considered here.  Specifically,

14

the assessment of Dr. Bal at pages 360-61 of the record transcript,[8] and the assessments of Dr. Petrie at pages 346-52 of the transcript, are not within the scope of judicial review as they were not submitted for the ALJ's consideration prior to ruling on plaintiff's claim, but were first offered to the agency's Appeals Council, which did not assume jurisdiction but deferred to the ALJ as the final agency decisionmaker.  E.g., Cotton v. Sullivan, 2 F.3d 692, 696 (6th Cir. 1993).

As to the opinions of Drs. Bal and Petrie that were before the ALJ, none can be said to support plaintiff's claim of total disability.  Dr. Bal followed plaintiff's severe obstructive sleep apnea treatment, and also treated his diabetes, hypertension, hyperlipidemia, multifactorial headaches, and symptoms of depression.  In October 2001, Dr. Bal recorded mild improvement in plaintiff's sleep and his fluctuating symptoms of depression, but recommended a psychiatric evaluation and consulted Dr. Petrie for that purpose (Tr. 193, 210).  By April 2002, plaintiff had adjusted to the treatment of his sleep apnea with a CPAP machine, with good results (Tr. 209).  Blood tests in May 2002 revealed good control of plaintiff's diabetes with insulin (Tr. 208), though there has since been fluctuation in the

---

[8]This summary of care and assessment is dated January 19, 2004, prior to the ALJ's decision, but it appears that the actual date of its rendering was January 19, 2005, given counsel's representation to that effect (Tr. 332) and the document's own reference to "blood tests Sept. 2004" (Tr. 361).

15

measure of control revealed by such test results. Plaintiff's hypertension was also noted to be controlled by medication (Tr. 203, 207). In January 2003, Dr. Bal noted plaintiff's report that his headaches were intermittent, and when they did occur he was able to dull the pain sufficiently to let him function by taking Percocet (Tr. 199). In April 2003, Dr. Bal noted that plaintiff was sleeping well, and was doing well overall despite a varying mood; he deferred to Dr. Petrie for treatment of plaintiff's depression. (Tr. 313) In October 2003, Dr. Bal continued to treat plaintiff's chronic headache with Percocet, and otherwise noted no abnormalities on examination or with the treatment of plaintiff's diabetes, hypertension, and hyperlipidemia (Tr. 321). In February 2004, Dr. Bal continued plaintiff's prescribed medications, while also keeping track of the changes in psychotropic medications by Dr. Petrie (Tr. 320).

While this treatment record plainly illustrates a number of physical problems that plaintiff has to deal with on a daily basis, Dr. Bal did not opine that these impairments were of disabling severity, nor did he submit an assessment of work-related limitations which conflicts with the ALJ's finding that plaintiff is limited to "simple, routine, light work, performing postural activities only on an occasional basis, but never climbing ladders, ropes, or scaffolds, no constant reaching with the left arm, frequent fingering, occasional exposure to hazards,

16

and only occasional contact with the general public." (Tr. 26, 27-28) Furthermore, as noted by the ALJ, plaintiff has in the past been able to work with the limitations which result from his obesity, and though his head injuries and their residuals forced him to leave his job as a truck driver in 1988, he was able to retrain and secure a job as a tool grinder/machinist in 1992. He was able to perform this job until 2001, when he allegedly became unable to work due to worsening symptoms of depression, not any exacerbation of his physical problems (Tr. 166, 193, 369).

In describing plaintiff's psychological condition after his initial consultation in November 2001, Dr. Petrie noted plaintiff's "significant depressive symptoms of poor concentration, crying spells, loss of interest, and a sense of alienation from his interests and even God." (Tr. 193) He further noted a number of organic symptoms including affective lability, but no psychotic symptoms despite plaintiff's troubling lack of initiative. (Tr. 194) Dr. Petrie noted plaintiff's favorable response to Effexor, and prescribed an increased dose of that drug followed by an increase in the antidepressant Pamelor (nortriptyline), after diagnosing recurrent depression and mixed personality disorder. (Tr. 193-94) Though there were periods of improvement with medication adjustments during quarterly visits to Dr. Petrie in 2002, plaintiff was noted to be "unable to work" in January 2002; "still disabled" in August

17

2002; to be "deserving of disability coverage" in April 2003; and, to "appear[] disabled except for the most simple of physical tasks" in May 2003. (Tr. 195, 303, 304, 306) However, on May 27, 2004, one day before plaintiff's hearing, Dr. Petrie submitted a medical source statement of plaintiff's work-related mental limitations, in which he opined that such limitations were no more than moderate (Tr. 326-27). Though Dr. Petrie further indicated in that statement that plaintiff's stamina and concentration were "reduced," he did not specify the degree of such reduction.[9]

   As noted by both the ALJ in his decision and defendant in its brief, Dr. Petrie's conclusions that plaintiff was disabled, unable to return to work, and the like are not for these purposes medical conclusions which are owed deference due to his status as a treating source, but are legal conclusions which are specifically and exclusively reserved for the ALJ to make after considering all the evidence regarding the nature and severity of plaintiff's impairments. 20 C.F.R. § 404.1527(e). The ALJ thus properly considered these conclusions for what they were worth, and did not assign them any additional weight due to

---

[9]The ALJ did not specifically discuss Dr. Petrie's assessment of only moderate work restrictions, but the hearing transcript reveals that the vocational expert was provided a copy of that assessment and questioned as to its impact on the jobs identified as available to a person with the RFC assigned by the ALJ. The expert responded that the limitations quantified in that assessment would not affect the ability to perform the work identified (Tr. 390-92).

18

the fact that they were drawn by a treating psychiatrist. The
ALJ reasoned that other evidence of improved symptoms without
psychosis from Dr. Petrie's treatment notes in November 2001 and
April 2003 undermined the psychiatrist's opinions in 2002 and
2003 that plaintiff was disabled (Tr. 26). This explanation for
the weight given the evidence from Dr. Petrie is reasonable and
substantially supported, all the more so in light of Dr. Petrie's
May 2004 assessment of limitations that were moderate at worst.

Contrary to plaintiff's arguments that his mental and
physical impairments were not properly considered in combination;
that his testimony and that of his wife was improperly rejected
without any reasonable, sufficiently specific justification being
given; and that the ALJ erroneously discounted the weight of
plaintiff's proof without considering whether it showed his
inability to sustain work activity on a regular and continuing
basis, it is clear to the undersigned that the ALJ satisfied all
such case-consideration and opinion-writing obligations, as
exemplified by the following passage from his decision:

> The claimant's statements concerning his impairments
> and their impact on his ability to work are not
> entirely credible in light of the discrepancies between
> the claimant's assertions and information contained in
> the documentary reports. The claimant testified he is
> unable to work due to residuals of a fracture[d] skull
> which occurred in 1998 and daily headache pain.
> However, results of a cranial CT scan in January 2001
> were normal. The claimant testified he was
> hospitalized in May 2001 to further evaluate heart
> problems, however, his chest x-ray was normal. The

19

claimant was subsequently diagnosed with sleep apnea and testified to fatigue at the hearing. However, progress notes show the claimant reported he was sleeping better in October 2001 and as recent as April 2003. Further, in August 2002, progress notes from Psychiatric consultants show the claimant was doing better and more active, and in the progress notes from Dr. Bal in April 2003, it is further noted the claimant was doing well overall, despite a variable mood (Ex. 2F, 7F, 9F, 11F). The claimant testified to disabling pain, however, his weight has always been in excess of 300 pounds. The claimant testified he experiences left shoulder pain, however, he has not received any treatment for that condition. In spite of his allegations, he is not taking strong pain medication. He testified his pain affects his daily activity, yet he reported multiple daily activities at his examination in October 2002 (Ex. 4F). Moreover, in a daily activity report [of] January 2003, the claimant stated he was able to wash clothes, carry wood, grocery shop, attend church, and travel to North Carolina every year (Ex. 10E).

With regard to his wife's testimony, the undersigned finds it was not persuasive in view of the overall evidence.

(Tr. 25)

Moreover, the ALJ plainly was not bound by the vocational expert's testimony that the limitations alleged by plaintiff would eliminate all work, as he made the substantially supported finding that those alleged limitations were not fully credible considering the record as a whole, but were only credible to the extent that they are consistent with the ability to perform "simple, routine, light work" with certain postural, manipulative, and environmental limitations, including no more

20

than occasional contact with the general public in deference to plaintiff's mental impairment.

Lastly, plaintiff's bare assertion that the ALJ failed to properly evaluate his impairments by reference to the Listings does not even identify which particular section of the Listings is alleged to have been improperly overlooked. Thus, no further discussion of this issue is warranted.

In sum, the ALJ properly considered the entire record that was before him, and sufficiently explained his reasons for denying plaintiff's claim by reference to substantial medical and testimonial evidence of plaintiff's ability to perform other work in the economy. The undersigned therefore finds defendant's decision to be substantially supported, free of error, and deserving of affirmance.

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment be **DENIED**, and that the decision of the SSA be **AFFIRMED.**

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in

which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Cowherd v. Million</u>, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

      **ENTERED** this 19th day of September, 2008.


        <u> s/ John S. Bryant          </u>
        JOHN S. BRYANT
        UNITED STATES MAGISTRATE JUDGE

Case 3:07-cv-00798   Document 15   Filed 09/19/08   Page 22 of 22 PageID #: 76